UNITED STATES of America,

v.

**Edwin PALACIOS and Jason Palacios, Defendants.**

No. S3 96 Cr. 372 (MGC).

United States District Court, S.D. New York.

March 7, 1997.

Mary Jo White, U.S. Attorney for the Southern District of New York by Sharon L. McCarthy, Assistant U.S. Attorney, New York City, for U.S.

David I. Schoen, New York City, for Edwin Palacios.

Gregory Cooper, New York City, for Jason Palacios.

*OPINION*

CEDARBAUM, District Judge.

Edwin and Jason Palacios are charged with murder for the purpose of gaining entrance to and maintaining and increasing their positions in the Almighty Latin King Queen Nation ("Latin Kings"), a racketeering enterprise, and with using and carrying a firearm during and in relation to such murder. They move to suppress physical evidence seized luring an examination of their property by FBI agents after they were arrested on the charges in this case and transferred into federal custody. On January 10, January 27, and February 18, 1997, I held evidentiary hearings on these and other motions to suppress. For the reasons that follow, these motions are granted.

## Facts

On May 22, 1996, Edwin and Jason Palacios were arrested at the Rockland County Jail by FBI agents and detectives from the New York City Police Department. At the request of FBI Special Agent Teresa Meehan, the defendants had been transferred to the Rockland County Jail from Albany County Correctional Facility, where they were serving state sentences. (Tr. 288.) Prior to the arrest, Agent Meehan agreed with the officials at the Rockland County Jail to take charge of the defendants' property because she knew that they would be staying in federal custody. (Tr. 288–89.) At the time the defendants were taken into federal custody, Jason Palacios'. property was transferred to Agent Meehan, (Tr. 290), and Edwin Palacios' property was transferred to FBI Special Agent Francis Schulte, (Tr. 444).

Edwin Palacios' property remained in Agent Schulte's locked filing cabinet in a locked FBI storage room until May 28, 1996. (Tr. 507.) On May 28, 1996, Agent Schulte conducted what he described as an "inventory review" of the property. (Tr. 502.) He did not make an itemized list. Instead, he prepared a short report as follows:

On the below date, the below listed Special Agent (SA) conducted an inventory review

of property belonging to EDWIN PALACIOS. This property was provided to SA SCHULTE on 5/22/96 by Rockland County Sheriff's Office (RCSO) Detective WILLIAM A BARBERA, telephone 914-638-5424. PALACIOS was in the custody of RCSO at the time that he was placed under arrest by SA SCHULTE.

An inventory of this property disclosed that it contains letters, documents, photographs and clothing.

Included in the photographs are eight (8) photographs of a metallic blue/green teal colored customized Nissan Pathfinder.

The above property is being maintained for possible evidence.

(Gov't Ex. 3504-E.) In preparing this summary, Agent Schulte read all the letters and documents from beginning to end. (Tr. 525.) When asked whether an inventory review was open-ended, and meant that an officer could examine whatever there was, Agent Schulte responded that that was his interpretation of an "inventory review." (Tr. 526.) He stated that "[e]verything in an inventory search, if it was in our possession, I would look through." (*Id.*)

Over a month after Agent Schulte's inventory review, Agent Meehan also examined Edwin Palacios' property over a period of three days, from July 1 to July 3, 1996. Agent Meehan testified that the second examination of Edwin Palacios' property was done at the request of the "government attorney." (Tr. 316–17.) Agent Meehan examined the property and prepared a four page list with a very detailed description of each item. (Ex. C to Gov't Letter of Feb. 20, 1997.) Agent Meehan testified that in making this list she read the contents of all the letters in search of evidence. (Tr. 326.)

Jason Palacios' property remained in an FBI storage room adjacent to Agent Meehan's squad room for nine days until May 31, 1996. (Tr. 367.) From May 31, 1996 to June 2, 1996, Agent Meehan inventoried Jason Palacios' property, (Tr. 369), and prepared a five page summary, giving a description of each item and indicating whether that item was returned to the Palacios family, discarded, or retained for evidentiary purposes, (Gov't Ex. 3503–D). In making this list,

Agent Meehan testified that she opened envelopes and read the letters to see "if it contained evidence of a crime." (Tr. 369–70.)

Agent Meehan testified that according to her understanding, there are three purposes for an inventory search: (i) to protect the FBI from any accusations of taking property; (ii) to make sure the property being stored in FBI space is safe; and (iii) to see if there is any contraband or evidence that should not be returned to the prisoner or his designee. (Tr. 291–92.) Agent Meehan distinguished between "doing a search" and "doing an inventory" by stating that:

> In a search you are looking for something in particular. In a[n] inventory you are making a list of every single thing that is in some sort of container and not looking for anything in particular, you are inventorying everything, and if you find evidence you find evidence.

(Tr. 321–22.)

Agent Meehan testified that her understanding of FBI "policy and procedure" required her to read letters from start to finish when doing an inventory search. (Tr. 326.) When asked what about the policy and procedure required her to read letters she responded:

> As I stated, evidence of a crime will not be returned, and letters can be evidence of a crime, so they are read for that purpose.

(Tr. 326.)

When asked whether there are standardized regulations, practices or policy statements within the FBI as to how to conduct an inventory search, Agent Meehan responded as follows:

> There may be. I'm not familiar with them. We have guidelines on how to do just about anything in the FBI, but I couldn't state them to you.

(Tr. 327.) Agent Meehan testified that she was unfamiliar with and did not review the FBI's written guidelines for inventory searches at the time Jason Palacios' property was searched, at the time she searched Edwin Palacios' property, or at the time of the evidentiary hearing on January 27, 1997. (Tr. 327, 371.)

## Discussion

The Fourth Amendment proscribes unreasonable searches and seizures. For a search to be reasonable under the Fourth Amendment, it must normally be conducted pursuant to a warrant. However, inventory searches are an exception to this general warrant requirement. *See Illinois v. Lafayette,* 462 U.S. 640, 643, 103 S.Ct. 2605, 2608, 77 L.Ed.2d 65 (1983); *South Dakota v. Opperman,* 428 U.S. 364, 367–76, 96 S.Ct. 3092, 3096–3101, 49 L.Ed.2d 1000 (1976). An inventory search is "reasonable" under the Fourth Amendment if it is conducted pursuant to standardized procedures or established routines, *see Florida v. Wells,* 495 U.S. 1, 4–5, 110 S.Ct. 1632, 1635–36, 109 L.Ed.2d 1 (1990), and if the search serves to (i) protect an owner's property while in police custody, (ii) insure against claims of lost, stolen, or vandalized property, and (iii) protect the police from danger, *Colorado v. Bertine,* 479 U.S. 367, 371–72, 107 S.Ct. 738, 740–41, 93 L.Ed.2d 739 (1987).

■ For an inventory search to be reasonable, it must be conducted in accordance with standardized procedures. The requirement of standardized procedures is based on the principle that an inventory search must not be a general rummaging for incriminating evidence. *Wells,* 495 U.S. at 4, 110 S.Ct. at 1635. Standardized procedures ensure against excessive police discretion which could make inventory searches a pretext for seeking evidence of criminal conduct. *See Bertine,* 479 U.S. at 375–76, 107 S.Ct. at 742–44; *United States v. Andrews,* 22 F.3d 1328, 1334 (5th Cir.1994); *United States v. Frank,* 864 F.2d 992, 1003 (3d Cir.1988).

■ The standardized procedures must be consistent with the limited caretaking, noninvestigative purposes for which inventory searches are allowed. Inventory searches are allowed without a warrant because they serve the important government interests of protecting the property, protecting the police from claims of losing, stealing, or vandalizing property, and guarding the police from danger. *Bertine,* 479 U.S. at 371–72, 107 S.Ct. at 740–41. In allowing warrantless inventory searches, courts have determined that these legitimate governmental interests outweigh the limited intrusion on an individual's privacy rights if the search is done according to standardized procedures and for the permissible purposes. *See Bertine,* 479 U.S. at 371–74, 107 S.Ct. at 740–42; *Lafayette,* 462 U.S. at 645–47, 103 S.Ct. at 2609–10.

■ When standardized procedures are followed and the inventory search is conducted for the permissible purposes, a searching officer's subjective intent or concerns do not necessarily invalidate an inventory search. *Frank,* 864 F.2d at 1001; *United States v. Orozco,* 715 F.2d 158, 161 (5th Cir.1983). Therefore, the fact that an officer may harbor an investigatory motive does not invalidate an otherwise appropriate inventory search. *See United States v. Rodriguez–Morales,* 929 F.2d 780, 787 (1st Cir.1991); *United States v. Gallo,* 927 F.2d 815, 819 (5th Cir.1991); *Frank,* 864 F.2d at 1001. Moreover, standardized procedures need not be in writing. Unwritten routine office practices can meet the requirement of standardized procedures. *See United States v. Thompson,* 29 F.3d 62, 65–66 (2d Cir.1994); *United States v. Arango–Correa,* 851 F.2d 54, 59 (2d Cir.1988).

## I.  Standardized Procedures

■ Agent Meehan and Agent Schulte did not follow the same procedure in examining and listing Jason and Edwin Palacios' property. Although they both carefully examined all of the property and read through all the letters and documents, they created completely different records of their respective examinations. Agent Schulte did not itemize the property and just wrote a brief three-sentence description. Agent Meehan on the other hand created a detailed itemization of all of Jason Palacios' property.

Furthermore, Agent Schulte, after looking through Edwin Palacios' property, retained all of it as "possible evidence." (Gov't Ex. 3504–E.) Agent Schulte retained Edwin Palacios' property even though he had no reason to believe that most of it was possible evidence. (Tr. 506.) Agent Meehan, on the other hand, returned some of Jason Palacios' property to his family, discarded some, and retained the rest. (Gov't Ex. 3503–D.) By

following different procedures, Agent Meehan and Agent Schulte did not follow a standardized procedure in conducting their initial inventory reviews.

In addition, because of the difference in the procedures followed by Agent Schulte and Agent Meehan, Assistant United States Attorney Richard Zabel requested that Agent Meehan examine Edwin Palacios' property over a month after Agent Schulte's initial inventory review. (Tr. 316–17; Gov't Letter of March 2, 1997.) Agent Meehan's search of Edwin Palacios' property was certainly not in accordance with any standardized procedure or routine practice for inventory searches. It was done subsequent to Agent Schulte's inventory review and at the express request of an Assistant United States Attorney.

Neither Agent Schulte nor Agent Meehan followed the FBI's written guidelines. The FBI's Legal Handbook for Special Agents provides the following guidelines for conducting an "Inventory of Personal Property:"

> Items of personal property removed from a person who has been arrested and is to be incarcerated should be carefully inventoried by Agents prior to being stored for safekeeping. A receipt for such property should be prepared and given to the arrestee. This inventory should include the contents of containers such as purses, shoulder bags, suitcases, etc., whether or not the containers are locked or sealed. In the event such containers are locked or sealed great care must be taken to minimize damage to the container or its contents while gaining access. This caretaking function must not be construed as an alternative to a search warrant whenever there is probable cause to believe that evidence or contraband is inside a container. Under those circumstances the container should be secured until a search warrant can be obtained.

(Ex. E to Gov't Letter of Feb. 20, 1997.)

Agent Meehan testified that she was not familiar with these guidelines. (Tr. 327, 371.) Neither Agent Meehan nor Agent Schulte conducted their "inventory" reviews prior to storing the property for safekeeping as required by the FBI guidelines. Jason Palacios' property remained in an FBI storage room for nine days before Agent Meehan did her inventory review. (Tr. 367.) Edwin Palacios' property remained in an FBI filing cabinet in a storage room for six days before any agent reviewed it. (Tr. 507.)

Instead of following the FBI guidelines, Agents Meehan and Schulte conducted their "inventory" searches with just a general understanding that unlike a warrant search, they were not restricted to particular items and could look through everything in a thorough manner. (Tr. 321–22, 326, 525–26.) Agents Meehan and Schulte read all the letters and documents from beginning to end and looked at all the items as carefully as they pleased. (Tr. 326, 525–26.) Such broad discretion to search generally and thoroughly is exactly what courts have tried to proscribe in requiring standardized procedures for inventory searches. "The underlying rationale for allowing for an inventory exception to the Fourth Amendment warrant rule is that police officers are not vested with discretion to determine the scope of an inventory search." *Bertine*, 479 U.S. at 376, 107 S.Ct. at 743 (Blackmun, J., concurring).

## II. Purpose of Inventory Searches

Agent Meehan believed that the purposes of her inventory searches were to protect the FBI from any accusations of taking property, to make sure the property being stored in FBI space is safe, and to look for any contraband or evidence. (Tr. 291–92.) Although the first two are permissible purposes for inventory searches, looking for evidence is not. *See Bertine*, 479 U.S. at 372, 107 S.Ct. at 741; *Thompson*, 29 F.3d at 65. If searching for evidence could be labeled a permissible inventory search, a search warrant would never be required for property of an arrested person.

Although Agent Schulte did not clearly testify about his understanding of the purposes behind an inventory search,[1] it is ap-

---

1. When Agent Schulte was asked about his purpose for looking through Edwin Palacios' belongings, he answered that "[t]he primary purpose at that time was to do an inventory of it and if we

parent that he was also guided by improper investigatory purposes. Agent Schulte noted in his report that he retained all of Edwin Palacios' property as "possible evidence." Furthermore, he opened all the envelopes and read through the letters and documents even though he did not suspect anything physically dangerous inside the letters. (Tr. 506.)

By asserting that searching for evidence is a permissible purpose for inventory searches, the government in effect argues that any property that lawfully comes into the custody of law enforcement officers may be searched for evidence. This theory effectively eliminates the need for a jurisprudence of permissible "inventory" searches. Under the current state of the law, however, inventory searches cannot be generalized rummaging for evidence. *Wells,* 495 U.S. at 4, 110 S.Ct. at 1635. Agent Meehan and Agent Schulte's searches appear to have been "purposeful and general means of discovering evidence of crime." *Bertine,* 479 U.S. at 376, 107 S.Ct. at 743 (Blackmun, J., concurring).

The government also argues that it was appropriate to read the letters and documents to protect the general public from danger, since Agent Schulte was aware that some members of the Latin Kings had communicated death orders from their jail cells. (Gov't Letter of Feb. 20, 1997.) If there was probable cause to believe that some of Jason or Edwin Palacios' letters contained death orders, Agent Schulte should have obtained a search warrant. An inventory search cannot be used as a substitute for obtaining a warrant.

### Conclusion

In searching Edwin Palacios' property on May 28, 1996 and from July 1 to July 3 of 1996 and Jason Palacios' property from May 31 to June 2 of 1996, Agents Meehan and Schulte did not follow standardized procedures. Moreover, they conducted the "inventories" for the purpose of finding evidence of criminal conduct. Therefore, de-

saw anything of evidence [he] would have docu-

fendants' motion to suppress the evidence seized from these searches is granted.

SO ORDERED.